# Ex parte Cassel and Spayd.

The duties and liabilities of trustees appointed by will, and the principles upon which they will be charged upon the settlement of their accounts.

ACCOUNTS of John Cassel and Christian Spayd, trustees under the will of George Frey deceased, which was in the following words.

In the name of God, Amen! I George Frey, of the town of Middletown, in the township of Swatara, in the county of Dauphin and state of Pennsylvania, merchant, being of sound mind and good understanding, thank God, but knowing that we are all mortal, do make this my last will and testament. I bequeath my soul into the hands of my Lord and Saviour Jesus Christ, who redeemed me with his precious blood. And as to my worldly estate which the Lord

has entrusted to and endowed me with, and which I would willingly so apply as that his holy name may be adored and praised through time and eternity: To this end I have concluded, with God's permission, to erect an Orphan-House, which shall be called " *Emmaus*" at the place I have chosen for that purpose near my mill, where I have already built a house which is as yet incomplete. And whereas I am seised in my demesne, as of fee, of and in the following described lands, mill, houses, rents, tenements and hereditaments, that is to say: all that water grist-mill, situate on the bank of the Swatara creek, near Middletown, in the township and county aforesaid, with a right to a mill-race or canal through the lands late of John Fisher deceased; also of two several tracts of land contiguous to each other, situate in the township and county aforesaid, containing four hundred and ninety-eight acres, and one-half acre which I purchased from Blair M'Clenachan; also one other tract of land which I purchased at different times from Andrew M'Clure, Roan M'Clure and Jonathan M'Clure, containing in the whole two hundred and eighty-four acres and one-quarter of an acre; also of several tracts of land and out-lots near or contiguous to the town of Middletown aforesaid, containing in the whole about one hundred and twenty acres, be the same more or less; also of four houses and lots of ground in the town of Middletown, to wit, one thereof wherein I now dwell, one other thereof now in the occupancy of Charles M'Dowel, one other thereof now in the occupancy of Memucan I. Howel, and one other thereof now in the occupancy of Michael Hemperly; also of divers lots of ground contained within the metes of the town-plot or diagram of the aforesaid town of Middletown which are as yet unimproved by buildings thereon; and also of divers ground rents issuing and payable to me out of various lots also contained within the metes of the town-plot or diagram aforesaid, all which will be made more fully appear by reference to my book entitled " *Grund Renthe von Middletown.*" Now to carry into effect and fulfil the charitable and benevolent purpose aforesaid, I do hereby devise and bequeath all my lands, mill, houses, outhouses, lots of ground and ground rents above mentioned and in part described, hereditaments and premises with their and every of their appurtenances, situate, lying and being in the township of Swatara aforesaid, in the said county of Dauphin, to John Landis, merchant, Doctor Charles Fisher, of Middletown, Jacob Rife, of Derry township, John Cassel, of Swatara township, yeomen, and the survivors or survivor of them, and to the heirs and assigns of such survivor, to hold to them and the survivors and survivor of them, and the heirs and assigns of such survivor, upon this especial trust and confidence, and to no other use, intent or purpose whatever, that is to say, in trust and to the intent that the said trustees shall permit and suffer my beloved wife Catherina, during her natural life, to reside in my present dwellinghouse, and to use and enjoy all and singular my personal property in and about the same house, and the lot of ground whereon it is built, with the

III.—3 B

[Ex parte Cassel and Spayd.]

appurtenances, in as full and ample manner as I myself now use and enjoy the same. Further, that the said trustees shall pay and deliver to my wife during her natural life such sum and sums of money and other articles, as she may from time to time stand in need of and demand, out of the annual rents and profits of my estate above devised; which devises to my beloved wife shall be deemed and taken to be in lieu and full satisfaction of her dower or thirds at common law. It is nevertheless my intent and meaning that one or more of the trustees shall cause an inventory to be made of the movable goods in and about my dwellinghouse, such as horses, horned cattle, hogs, wagons, beds, chairs, tables, and household furniture in general, and of every thing in the store or cellars; yet my dear wife shall have power and authority to use the said articles as she may think right and reasonable; but after her death whatever may remain of the personal property which was in the hands and possession of my wife shall return to and be vested in the general fund of my estate, which is hereinafter appropriated for the support of the orphan-house: and further, it is my intent and meaning, that all my real estate above devised to the trustees aforesaid (except such part of it as I have appointed to the use of my wife during her natural life, and also that part from and after her decease) shall enure to and be vested in the trustees aforesaid, and the survivors and survivor of them, and the heirs and assigns of such survivor, *in* trust and confidence, and to the intent and purpose that the annual rents and profits of the said real estate shall be applied to the support of the said orphan-house, and to the maintenance and education of so many poor and orphan children (whom I shall more particularly designate) as the proceeds of the estate will bear. And in aid of the aggregate fund which may be formed in the hands of the trustees out of the rents and profits of my real estate, I do hereby bequeath to them, the survivors and the survivor of ·them, all and singular my personal goods and effects of what nature and kind soever it may be (subject to the appointments to my wife), to be by them, the survivors and survivor of them, applied to the same uses and purposes as is directed as to the rents and profits of my real estate.

For the better ordering and governing the orphan-house contemplated to be established by this my last will, I do ordain and declare that the trustees aforesaid, shall be members of that institution. A person whom I shall hereinafter nominate, shall be styled the Principal of the orphan-house (*Waysenvater*) and also a person who shall be the Tutor, shall also be members of the institution. That these persons shall immediately, or within one year after my decease (if they have funds sufficient in their hands), proceed to carry this my last will into effect; but if such funds shall not suffice for that purpose, then I do direct that such proceedings shall be adopted at farthest, within two years after my death. As it is my intention that the rents and profits of my real estate, and also the personal estate herein before devised and bequeathed, shall in perpetuity be applied

to the charitable purpose aforesaid, it is my desire, as far as in me lies, so to modify and fix the manner of the election of the trustees and other officers of the institution, that there may not at any time be a failure of functionaries to manage and conduct the economy of the orphan-house according to the true intent and meaning of this my last will, I therefore declare it to be my will, in case of the death of either of the trustees aforesaid, or if a trustee who shall come in by election as hereinafter directed dies, or in case any of the trustees aforesaid, whether in by nomination or election, shall remove from the county of Dauphin, or in case a trustee, whether by nomination or election, shall neglect by the space of three months to perform the duties of trustee under this my will, or shall refuse to perform those duties, that then the remaining or acting trustees, together with the principal and the tutor, shall within one calendar month after the happening of either of the contingences aforesaid, convene at the orphan-house, and then and there by a majority of voices, elect a freeholder of the county of Dauphin, and resident within the same county, as a trustee instead of the trustee so dying or removing, or neglecting or refusing to perform the duties of a trustee, which election shall be fairly entered in a book to be kept for that purpose in the orphan-house.  And further, it is my will that the person so elected a trustee, shall forthwith be vested with all the rights, powers and privileges of a trustee under this my last will, in as full and ample manner as any of the trustees hereinbefore named personally.

And further, it is my will that in case of the death, removal from the county, dismissal from office for any of the causes hereinafter set forth, of the principal, or of the tutor, or of either of them, that then the trustees shall make entries of the facts in the book aforesaid; and if a tutor is to be elected, with the principal, or if the principal is to be elected, with the tutor, immediately by a majority of voices, elect an honest, sober, and qualified person to fill the vacant office, as the case may be; of which election fair entries shall be made in the book aforesaid, and from thenceforth the person so elected shall be entitled to, and hold and enjoy all the rights, powers and privileges and emoluments attached to the office to which he has been elected.

And to the intent that all future litigation on this subject shall be precluded and done away as speedily as possible, whether it relates to the election or elections of a trustee or trustees, a principal or tutor, it is further my will and desire, that a return of such election or elections shall, by the said trustees, or by a majority of them, be laid before the judges of the court of common pleas for the time being, in and for the said county of Dauphin, at the next stated term of the said court, or at an adjourned court next following such election or elections, as the case may be.

And if the said judges, or a majority of those who shall be then present, shall be of opinion that such election or elections, is or are made in conformity to this the directions of my last will, that then they shall confirm the same, and such confirmation shall be final and

[Ex parte Cassel and Spayd.]

conclusive, and absolutely debar all and every other court now existing, or which shall hereafter exist within Pennsylvania, from exercising any authority, power or jurisdiction over, about or concerning such election or elections. But if it should appear to the said judges, that said election or elections is, or are not in conformity to the directions aforesaid, that then it shall be the duty of the said trustees and other officers of the institution, within one calendar month thereafter, to proceed to a new election or elections, as hereinbefore directed. And further it is my will that if a trustee, whether he be nominated by me or come in by election as is hereinbefore prescribed, shall remove out of the county of Dauphin, or if a trustee shall neglect or refuse to perform the duties of a trustee, or if the election or elections of a trustee, principal, or tutor, has or have not been made in conformity with the directions of this my last will, that then and in every such case of a removal, neglect, or refusal or of defective election, the trustee, principal, or tutor shall severally and respectively be divested of all right, title, power, authority and emolument, derived under this my last will ; but nothing herein specified shall be taken to exclude such persons (they being otherwise duly qualified) from being re-elected to those offices respectively.

For the purpose of directing, controlling and explaining to the trustees and officers of the orphan-house, my will as to the economy of the house, I shall in this place undertake, so far as human frailty will permit, to draw an outline of the duties enjoined upon their respective stations and offices.

I. Of the duties of the trustees.

1. The trustees shall at all times hereafter have power to convene the principal before them, or a majority of them, with his papers and books of accounts, and minutely to examine whether such accounts are honest and accurate as becomes a Christian.

2. If it should appear upon any such examination, that the accounts of the principal are wilfully inaccurate and unjust, or that he is careless in the management of the concerns of the institution, or that he is addicted to any enormous vices, such as inebriety, swearing, lying, gambling, cheating and the like, the trustees shall have power to displace him, and elect another in his stead, in the manner above directed.

3. It shall be the duty of the trustees and the principal, once in every month if it be necessary, or once in every two months at farthest, to meet at the orphan-house and liquidate the accounts of the institution, and to examine into the method of husbandry and agriculture pursued upon the lands of the institution, and to suggest to each other and consult upon such subjects as may tend to the benefit and advantage of the trust estate ; for this service each person above named, shall receive one dollar per day out of the funds of the institution.

4. The trustees shall have power, together with the principal, to build or finish the orphan-house (if that is not done before my death), and also to add or make any new buildings thereto, if it shall be

[Ex parte Cassel and Spayd.]

deemed necessary and useful to the institution; in the doing of which I enjoin it upon them to have an eye to economy, as well as to the comfort and conveniency of those who shall hereafter inhabit the house. It is also my will, that if hereafter the trustees and principal, finding that the funds of the institution are adequate to such purposes, and that it will contribute to its benefit, shall have power to erect any other mill or mills, or machinery or water work, for or in aid of manufactories on the mill-race or canal aforesaid; so also they shall have power to erect any other buildings on the lots near or adjoining to the dwellinghouses aforesaid, and on the several farms, if they shall deem it necessary and beneficial to the institution; but it is expressly my intention, and I do hereby declare it to be my will, that no part of the estate hereinbefore devised to the said trustees, shall ever hereafter be sold, or in any manner severed from the orphan-house, but that it shall remain united thereto, whole and undivided for ever.

5. When the orphan-house shall be in a state suitable to the reception of its inhabitants, it is my will and direction to the trustees, the principal and the tutor, that they shall receive into it for the purpose of maintenance and education (free from all expense or charge to the children or their relatives), all such poor, but healthy orphan children, as shall be of the age of five years and under the age of twelve years, whether they be boys or girls. The trustees, principal and tutor, shall, nevertheless, have power to receive into the orphan-house, and they are hereby enjoined to maintain and educate poor children within the age aforesaid, whose parents from want of property, are unable to maintain or educate them; but in this particular the discretion of the trustees and other officers, shall be governed by the extent of the existing funds of the orphan-house, at the time of the application for admission. These children shall be admitted upon this express condition: that is, that the children, both male and female, shall be educated in the Evangelical Lutheran religion, and in the German language; nor shall any other language than the German be taught in the orphan-house. It is further my will, that the children thus received into and educated in the orphan-house, may remain there, the boys until the age of fifteen years, and the girls until the age of fourteen years, at which several and respective ages, they shall each of them receive a freedom suit. If, however, any of those children, whether boys or girls, when they arrive at the ages of fifteen and fourteen years respectively, shall be inclined to remain in the institution, in the manner and upon the terms the trustees and officers can reasonably offer to others, then it is my will those children shall have a preference, and be engaged and employed, either in the household, the agriculture, or the arts and manufactures, such as the industry, care and economy of the institution in future times may be able to afford them.

II. Of the duties of the principal of the orphan-house.

1. The principal shall have the immediate superintendence and

[Ex parte Cassel and Spayd.]

management of the whole estate hereinbefore devised to the trustees for the use of the orphan-house; and it shall be his particular and appropriate duty, to oversee and direct the agricultural concerns thereof: nevertheless, in this as in every other part of his official duties, he shall be subject to the advice, and conform to the directions of the trustees, or a majority of them.

2. The principal shall keep a regular book or books, in which he shall correctly state all the receipts as they happen daily, and all the daily expenditures, so that at the end of a month or of every second month at farthest, he shall account honestly and correctly (as a good Christian ought) with the trustees.

3. The principal shall be permitted with his family to reside in one of the four houses above mentioned, and have a free table for himself and his family, to be furnished him out of the proceeds of the trust estate, and also 266 dollars 67 cents yearly, and every year during his continuance in office as principal of the orphan-house.

4. It shall be the duty of the principal to take upon himself the care and superintendence of the mill, and other water works and machinery which may hereafter be erected on the mill-race or canal. He shall keep a book or books in the manner I have hitherto done. When he buys wheat or sells flour, or when he sends flour to market, to whom and by whom it is sent, all shall be correctly and regularly entered. In short, he shall keep an exact account or accounts of all the receipts and payments relative to the mill or other water works.

5. He shall have power to hire millers and other artizans of honest and faithful characters and demeanour, from time to time, as it may be necessary, and shall closely observe that their accounts be accurate and clear.

6. He shall take care that the mill, dwellinghouses, farmhouses and outhouses of all kinds be kept in good repair, and that no waste or destruction happens, and if any such should happen, he shall, as soon as convenient with his other duties, superintend and direct the reparation. If the principal has children of his own who are competent to labour, they shall have reasonable wages when they shall labour for the institution. If the principal by reason of old age shall be incapable to fulfil the duties of his office and had conducted faithfully and honestly therein, he shall be supported during his life out of the funds of the institution, and if he has a son who is equally well disposed, honest and faithful, he shall have preference given him by the trustees and tutor, and be appointed as principal in the stead of his superannuated or deceased father.

III. Of the duties of the tutor.

In regard to these duties, which will be numerous, various and arduous, much must depend upon the piety, industry and good sense of the tutor, as well as upon his bodily health, and the different ages, sexes, industry, capacity and talents of the pupils, as on the state of the church to which this institution will be allied, its government in

[Ex parte Cassel and Spayd.]

clerical matters and the discipline in its schools.　Hence there seems to be a necessity to devolve upon the trustees, the principal and the tutor conjunctively, or by a majority of voices, a power of modifying and conforming the mode of tuition of the pupils of the institution to the orthodox belief of the church and the method practised in its schools: under a sincere hope however that the Almighty has enlightened my understanding in this my weak effort to disseminate a knowledge of his grace toward mankind, to the fatherless and the needy, and firmly believing that he will· sanction by his blessings my endeavours to comfort in this life the forlorn and distressed infant, I do herein direct that the following rules and regulations shall for the present be observed by the tutor.

1. It shall be the duty of the tutor at the ringing of a bell at six of the clock in the morning (in a room or hall to be appropriated for pious purposes in the orphan-house), to sing a morning or other pious hymn with the children, and then to pray a morning blessing, kneeling together, with the Lord's prayer.　They shall afterwards repeat the Christian belief and the principles of the Lutheran catechism. Breakfast shall then follow.　After breakfast the school shall be kept for two hours, in which the pupils shall be taught reading, writing and arithmetic, and particularly shall be instructed in the aforesaid catechism until about nine of the clock; then they shall work in the garden or be employed in some other useful manner.　In what relates to the garden I enjoin upon my trustees, the principal and tutor, that they shall lay off and appropriate ten acres of ground contiguous to the orphan-house, which shall be cultivated principally as a kitchen-garden, for the use of those who shall dwell in the orphan-house; and if there should be a surplus produce, to the profit of the general fund of the institution; yet it is not my idea that the gardening shall by any means be confined merely to the supply of the kitchen, but it is my desire that it may be decorated with all the fine fruits of the climate, such as apples, pears, cherries, peaches, grapes, and so forth, in all their varieties.　Besides the usual vegetables of a kitchen-garden, hemp and flax shall be raised for the industry of the orphan-house.　About eleven of the clock in the forenoon the bell shall ring again; a thanksgiving, accompanied by the ceremonial of the knee prayers and belief, as in the morning shall be repeated.　The children shall then dine.　After dining there shall be school for two hours, and then they shall again work in the garden.　In the evening, about six of the clock, a bell shall again be rung, an evening hymn or other religious hymn shall be sung with the children, and the ceremonial and prayers of the morning be again repeated.　In winter, after supper, the girls about six years old shall be taught to spin.　When the children have been taught to read, one of the boys shall repeat a chapter out of the bible.

2. An orphan shall not be permitted to leave the orphan-house without leave from the tutor; and if a child should be stubborn,

contumelious. or disobedient and incorrigible, the trustees shall bind it to a trade according to the law of the land.

3. When the tutor shall have occasion to send of an errand, he shall not send one child singly but two together, either two boys or two girls.

4. If the tutor shall observe any child addict itself to lying, or any other immoral behaviour or language, he must be sure to correct the offender.

5. When the principal is at hay-making the tutor shall direct so many children as he may want to assist him. So when apples are brought from the farms, the children shall cut and dry them. If the boys possess enough bodily strength they shall assist the principal in taking care of the cattle of the institution, and other work which may be necessary, between school hours.

6. After a time, when the trustees, &c., shall find it comport with the funds of the institution, the weaver's art shall be introduced into the orphan-house; as it is my intention that children at all seasons shall be clothed in home manufactures. The boys in brown. The under garments of the girls, shall be linsey-wolsey, but their upper garments shall be of blue striped cotton stuffs, so that each of the sexes shall have peculiar and uniform clothing, to be given annually at the feast of Eastern.

7. The tutoress, or some other woman well qualified for the purpose, shall teach the girls needle-work, knitting and spinning. If any of the children should be sick, it is my desire that those in health, particularly the girls, shall be assistant in washing, cleansing, &c. so that every thing may be kept in neatness and good order.

8. It is my desire, that the utmost care be applied to the instruction of the children in good morals, and sound religious principles, in in order that they may become sober, industrious and worthy citizens. Therefore no books shall be used in the schools of the institution, but such as have those tendencies.

9. When a child is near fourteen years old, it shall be confirmed, and afterwards be admitted to the holy sacrament of the Lord's supper.

10. The tutor (who must be a married man) shall reside in the orphan-house, and have a free table for himself and family, to be furnished to him out of the proceeds of the trust estate, and also 200 dollars yearly and every year during his continuance in office as tutor of the orphan-house. If the tutor has conducted faithfully and industriously, and by reason of old age cannot continue to fulfil the duties of his office, he shall be supported during life out of the funds of the institution, and an allowance made him annually at the discretion of the trustees. It is further my will and desire, that if there should be any evil report circulated concerning a trustee, principal or tutor, which frequently may happen in their stations, the trustees, principal and tutor, shall examine the matter according to the exhortation of Jesus, Matthew ch. 18, v. 15—17, but if the

charge be of a vicious and immoral nature, or comes within the description contained in the second article under the first head of duties, and the party is found guilty, they shall have power to dismiss him from office, and elect another in his stead, as is hereinbefore directed, which election shall be subject to the same rules and regulations as other elections under this my last will.

As, from the imbecility of the human character, and the versatility of the affairs of this world, it is rendered almost impossible to provide such checks and restraints as will in all events guard against the arts and impositions of wily and designing men, it therefore is my further will and desire, that the trustees, the principal, and the tutor, or a majority of them, for the time being, shall annually for ever after my death, submit to the court and grand jury of the county of Dauphin, at the first court of general quarter sessions of the peace which shall be holden in and for the same county in the beginning of the year, a statement of all their accounts relative to the orphan-house and the estate hereinbefore devised for the support thereof, for the year preceding such submission. Such accounts shall contain a particular statement of the receipts for that year, whence derived, and for what; and also a particular statement of the disbursements for that year, and be accompanied by sufficient vouchers. And if the court aforesaid should require it, the trustees, principal, and tutor, or some of them, shall lay before the said court and grand jury, once in every year, a particular statement of the number of children, male and female, with their respective ages, who have been maintained and educated in the said orphan-house for one or more years preceding. But if the accounts so to be annually submitted, shall in the opinion of the court be too voluminous or intricate for examination during the then session, it is my will, and I do hereby authorize and empower the said court to nominate and appoint three respectable members of the same grand jury, who shall have power during the ensuing vacation, to examine, liquidate, and settle the same accounts, and to make report thereof to the then next court, which report, if approved, shall be final and conclusive to the accountants. The balance so found, if in favour of the accountants, shall be placed to their credit; if against them, shall go to their debit in their accounts for the ensuing year. If the said trustees, principal, and tutor, shall, after my death, neglect or refuse to exhibit and submit such accounts at the time and in the manner above directed, it is my will and desire, that the said court of general quarter sessions of the peace shall have power and authority, by attachment or otherwise, to compel the said trustees, principal, and tutor, to account as aforesaid.

It is further my will, and I do hereby authorize and empower the judges of the court of common pleas, for the time being, in and for the county of Dauphin, at the first stated term in each year after my death, by a majority of voices, to nominate and appoint a respectable freeholder of the county of Dauphin, as visitor of the orphan-house.

III.—3 c

[Ex parte Cassel and Spayd.]

It shall be the duty of the visitor, and he shall have a right, power and authority, without denial, hindrance, molestation or impediment from the trustees, principal or tutor, or any of them, or from any person or persons under their care, or in their employ, to enter into the said orphan-house, and into every part thereof, and into all the buildings and outhouses appertaining thereto, and every of them, as also into the mill or mills and other water works, as also into all and every of the dwellinghouses, shop or shops, and outhouses appertaining to them or either of them, and also into the farms, houses, barns, stables and other outhouses belonging thereto, for the purpose of inspection, and that twice in the year, viz. once in the spring and once in autumn. The precise time shall be in the discretion of the visitor. In the course of the visitor's inspection, a trustee or trustees, the principal of the orphan-house and tutor (they having severally forty-eight hours previous notice in writing, of the time of the intended visitation) shall accompany the visitor, and freely and candidly answer any questions he may propose to them or either of them respecting the economy of the orphan-house, the mill or mills, or other water works, the manufactories of the institution, the garden, the farms, the method of culture of each, and concerning the expenditure of labour or money upon, and product of each and every of them.

2. The visitor shall inquire into and inspect the manner of tuition of the orphans, how they are employed between school hours, of their behaviour morally and religiously, concerning their food, their clothing, their bedding, and in general to ascertain from actual view and observation whether the economy of the institution is conducted upon principles such as my bounty and the directions of this my last will do require.

3. The visitor, at the then next court of common pleas after such visitation, shall make report to the said court in detail of his observations upon and management of the funds of the institution. The court, upon such report being made, may approve thereof, or if there be a good ground laid in such report for so doing, may censure or reprimand a trustee or trustees, principal or tutor for negligence or mismanagement in the economy of the institution by them or any of them. But if it appears to the said court of common pleas, that great dilapidations have been permitted by the principal, or that a trustee or trustees, the principal or tutor, have been guilty of a gross and vicious misapplication of the funds of the institution, the said court shall have power and authority, in a summary way, to remove such trustee or trustees, principal or tutor, as the case may be, from office : upon which removal, it shall be the duty of the remaining trustee or trustees, principal or tutor, as the case may be, to elect a person or persons in the stead and place of such trustee or trustees, principal or tutor so removed : which election shall be conducted in the same manner, and be subject to the same rules and regulations, as are hereinbefore directed as to elections. But no trustee, principal or

tutor, who has been removed from office for dilapidation or misapplication of the funds of the institution as aforesaid, shall be eligible to any office or employment in the orphan-house, or the estate thereto appertaining.

It is further my will and intention, that whensoever the town of Middletown shall become an incorporated borough, that then, and from henceforth, the power of the court of common pleas aforesaid to nominate and appoint a visitor, shall cease, determine and become absolutely void; and that the power and authority and privileges delegated by me to the visitor, shall be immediately transferred to, and be vested in the burgesses of the borough of Middletown for ever; and be exercised by them in the same extent and manner, and subject to the same duties as the visitor appointed by the court of common pleas had and held the same.

If in the dispensation of providence, it should so occur that this institution, the benefits of which I would have to descend to future ages, should fail or be dissolved, because of the death, emigration, or removal of the trustees and other officers for dilapidation or mismanagement as aforesaid, or in consequence of some public calamity or other means, it is my will and desire, that then the governor of Pennsylvania, for the time being, shall have power and authority to nominate and appoint in writing, under his hand and the less seal of the state, such and so many trustees, a principal of the orphan-house and a tutor, as I have hereinbefore named, according to the provisions contained in this my last will. And it is further my will, that the persons so to be appointed by the governor of Pennsylvania, shall forthwith hold and enjoy their several and respective offices of trustees, principal and tutor, with all the powers, rights, privileges and emoluments of their several and respective offices, as fully and amply as the trustees, principal and tutor herein personally named, and be subject to the same duties, and be accountable in the same manner as is hereinbefore directed.

And further it is my will, and I do hereby devise to the trustees first and personally named in this my last will, and to the survivors and survivor of them and to the heirs and assigns of such survivor, all that tract or parcel of land, situate in Middle creek, in Penn's township, in the county of Northumberland, containing two hundred and seven acres and thirty-eight perches, be the same more or less, and which is known by the name of Beaver Dam, to hold to them and the survivors and survivor of them, and to the heirs and assigns of such survivor in trust, and to the intent that they or the survivors or survivor of them, immediately after my decease, shall sell the same to the best bidder, and for the highest sum that can be gotten therefor, in fee simple; and that the money arising from such sale, shall be applied to the same uses and purposes as is directed herein, as to the rents and profits of my real estate, hereinbefore devised.

It is further my will, that if hereafter any legacy, bequest or do-

[Ex parte Cassel and Spayd.]

nation should be bequeathed or given to the Emmaus orphan-house when it shall be incorporated, or before that period, to the trustees, principal or tutor, or either of them by name, for the use of the institution, that the principal shall enter such legacy, bequest or donation in a book to be kept in the orphan-house for that purpose—noting particularly the name of the donor (if that is permitted by him or her), the time and amount of the donation, and once in every year about the anniversary of such donation, if a sermon should be then preached in the orphan-house, the clergyman shall mention publicly the circumstances of such bounty.

And further it is my will, that the trustees, who shall hereafter be elected by virtue of this my last will, shall be respectable freeholders of the county of Dauphin, of good moral and religious characters, and be regular members of some one of the churches of the protestant religion; but the principal of the orphan-house, and the tutor, shall at all times hereafter be persons of sound religious principles, of good morals, and be regular members of the Evangelical Lutheran religion according to the Augsburg confession.

Further it is my will, and I do hereby nominate and appoint John Cassel aforesaid, yeoman, as the principal of the orphan-house, to hold and enjoy the same office, in the manner and upon the terms hereinbefore set forth. And I do hereby nominate and appoint              as the tutor of the orphan-house, to hold and enjoy the same office, upon the terms and in the manner hereinbefore set forth.

And further it is my will and desire, that the trustees, the principal and the tutor, at the session of the legislature of Pennsylvania, next after my decease, shall apply by petition to his excellency the governor, and the honourable the senate and house of representatives, that they will severally pass an act, constituting the said trustees, principal of the orphan-house and tutor, a body politic and corporate, by the style and title of the Emmaus orphan-house, with the usual and necessary corporate powers, as nearly conformable to the spirit and meaning of this my last will as may be.

Lastly, I do hereby nominate and appoint the trustees herein first and personally named, the survivors and survivor of them, executors of this my last will and testament, and do hereby revoke, annul and make void all other will or wills, testament or testaments, by me heretofore made. In witness whereof, I hereto set my hand and seal, the 12th day of May, in the year of our Lord 1806.

GEORGE FREY, [L. S.]

Signed, sealed, published, pronounced and declared by the testator as and for his last will and testament, in presence of us, John Blattenberger, Jun., Abraham Rife, Charles Brandon.

Proved May 31, 1806.

I, George Frey, of Middletown, in the county of Dauphin, and commonwealth of Pennsylvania, merchant, do make this codicil to

be taken as part of my last will and testament. It is my will that all my real estate of whatever kind not otherwise appropriated or mentioned in my last will and testament, shall be sold when convenient, and the moneys arising from such sales to be put into the hands of the trustees mentioned in my said last will, for the use of the charitable institution or orphan-house mentioned in my said last will. It is also my will that all moneys due to me on bond, note or book account, or otherwise, when recovered, shall also be put into the hands of the aforesaid trustees, for the use and benefit of the said charitable institution or orphan-house; and as there are several tracts of land now in controversy, and suits have commenced for the recovery thereof, and probably more controversies may arise respecting lands which I claim as my right, it is my will that all such lands be recovered as soon as the nature of the case may admit, and the lands sold, and the moneys thereof be appropriated as aforesaid; and I do hereby nominate and appoint my trusty and loving friend John Crabb, Sen. of Middletown aforesaid, and now residing in my family, to be my agent in carrying on all suits for the recovery of all lands in controversy; and also, I do hereby nominate and appoint the said John Crabb, Sen. my lawful agent to recover all other moneys which may be endue me in anywise, and for which he, the said John Crabb, shall receive 10 pounds out of every 100 pounds for all such moneys so recovered either by the sale of lands or otherwise; and the said John Crabb is to reside with my family and is to have 100 dollars each and every year while he remains in said employment, over and above the said 10 pounds out of each 100 pounds. It is also my will, that the present German school kept by Frederick Miller, in Middletown, shall continue and be kept in the same manner and under the same regulations and emoluments as heretofore, until such time as the said orphan-house shall be completed. And further, it is my will that the said John Crabb, my agent, shall be allowed to keep a horse, and to have money to bear his reasonable expenses while on business aforesaid. In witness whereof I have hereunto set my hand and seal, the 12th day of May, in the year of our Lord 1806.

                              GEORGE FREY, [L. S.]

Signed, sealed, published, pronounced and declared by the testator as a codicil to his last will and testament, in presence of us, John Blattenberger, Jun., Abraham Rife, Charles Brandon.

Proved May 31, 1806.

The following report of auditors, to whom the accounts were referred by the supreme court, exhibits all the facts which gave rise to the questions argued and determined.

Report of auditors on the account of John Cassel and Christian Spayd.

The auditors appointed by the supreme court on the 25th of May 1829, to take the accounts, either jointly or separately, on thirty days

notice, of Christian Spayd, George Lowman and John Cassel, trustees under the last will of George Frey deceased, respectfully report:

That in pursuance of the order of the court, the notice required having been given, the auditors met on the 24th of July 1829, at the house of J. B. Henszey, in the borough of Harrisburg, and after being sworn, entered upon the duties assigned to them, all the accountants being present, and proposed to settle their accounts separately. They were ordered by the board to file their accounts for the inspection of the counsel for the petitioners, and the board adjourned to meet on the 12th of August; when further examinations being made, the board adjourned until the 10th of September. At this meeting, Christian Spayd and John Cassel having filed accounts, examinations in detail were commenced, and the accountants were questioned upon oath. After spending several days in comparing the accounts with the entries in the books, and hearing objections and explanations, it was discovered that the manner in which the accounts were stated was not satisfactory; the board then gave detailed instructions to Mr Spayd, requiring the different items of receipts and expenditures to be arranged under distinct heads, and adjourned until the 8th of October, when similar instructions were given to Mr Cassel, and on the 26th of October the revised accounts were exhibited, and the counsel for the petitioners propounded their interrogatories in writing, copies of which were ordered to be furnished to the accountants, who were directed to file their answers on the third Monday in November, and the board adjourned to meet on the 28th of December; at which meeting the answers to the interrogatories having been filed, supplemental interrogatories were propounded to the accountants by the counsel for the petitioners, and the board adjourned until the 16th of January, when the supplemental answers were exhibited, and the counsel for the petitioners were allowed five weeks for filing their exceptions, and the board adjourned until the 29th of March, at which time, and on the 12th of April, 5th, 8th and 19th of May, and the 2d of June, the board met and received sundry depositions and records in evidence, and heard a variety of parol testimony, and the arguments of counsel on both sides. On the 5th of June the testimony and pleadings were closed, and the board adjourned to meet the 18th of June, for the purpose of deliberating and deciding upon the numerous and complicated questions which in the course of this tedious and perplexing examination were submitted. After spending several days, they adjourned, and met on the 28th of October and 16th of November, when they agreed upon this report. This statement is made for the purpose of showing the means that were taken for the purpose of discharging the duty assigned to the auditors, and also for the purpose of accounting for the delay which has occurred in making this report.

One of the first subjects for the consideration of the auditors, was the will of the testator; a printed copy is herewith submitted, proved

the 31st of May 1806, under which the trust estate in the hands of the accountants was created.

The following parts of the will appear to have relation to duties, &c. of the trustees, before the orphan-house was contemplated to be in operation.

The principal object of the testator was to erect an orphan-house upon his real estate for the maintenance and education (free from all expense or charge to the children or their relatives) of all such poor but healthy orphan children as shall be of the age of five years and under the age of twelve years, whether they be boys or girls, as the estate will admit, to be educated in the German language, and in the tenets of the Lutheran religion. The boys to remain there until the age of fifteen, and the girls until fourteen years of age.

For the purpose of effecting this object, the testator devised to J. Landis, Charles Fisher, Jacob Rife and John Cassel, and to the survivors or survivor of them and to the heirs and assigns of such survivor, certain described real estate in and about Middletown, and ground rents and personal estate, also the proceeds of the Beaver Dam farm in Northumberland county, to hold to them and the survivors and survivor of them and the heirs and assigns of such survivor, upon this especial trust and confidence, and no other.

1. In trust, and to the intent that his wife Catharine should during her natural life reside in his dwellinghouse, and use and enjoy all and singular his personal property in and about the house and lot of ground, with the appurtenances, in as full and ample a manner as he himself then used and enjoyed the same.

2. That the trustees should pay and deliver to his said wife such sums of money and other articles as she might from time to time stand in need of and demand, out of the annual rents of the estate devised.

An inventory was to be taken of the said personal property by one or more of the trustees, without interfering with the right of the wife to use the same as she might think right and reasonable, and upon her death whatever might remain of the said personal property, was to return to and be vested in the general fund of his estate.

3. That the annual rents and profits of the real estate devised and all his personal estate (except the provision for his wife) should be applied in perpetuity to the support of the orphan-house and to the maintenance and education of as many poor orphan children as the proceeds of the estate would bear.

The funds for the support of the institution being thus created, the testator proceeds to make provision for its government. In addition to the four trustees, the officers were to consist of a principal and tutor. As the testator appointed one of the trustees principal, the presumption arises that this officer may or may not be a trustee. The trustees, principal and tutor, were vested with power to supply vacancies that might occur in the board of trustees, or in the office of principal or tutor. These officers were directed within one year

after the testator's death, or within two years at farthest, to carry the will into effect and put the orphan-house in operation.

John Cassel, one of the trustees, is appointed principal of the institution, and the trustees, viz. John Landis, Charles Fisher, Jacob Rife and John Cassel, and the survivors and survivor of them, are appointed executors of the will.

A feigned issue to try the validity of the will was tried in the circuit court of Dauphin county before the chief justice, and a verdict was given on the 16th of April 1807, finding in favour of the validity of the will, and against the codicil.

As the erection of the orphan-house has not been carried into effect, the auditors took and examined the accounts of the trustees as to the period which was contemplated by the testator to intervene between his death and the commencement of operations in the orphan's court.

In the trial of the validity of the will, the executors employed three eminent counsel—Messrs Duncan, Smith and Montgomery, to *each* of whom they gave the security of the trust estate for the payment of about 600 pounds. This debt, thus created by the executors at the commencement of the trust, was one of the causes of the embarrassment.

The will being established, the trustees, principal and executors entered upon the duties of their respective offices, the lines of which, as will hereafter appear, were *not in practice* marked with any kind of precision. This circumstance has caused much of the difficulty encountered by the auditors.

The following changes have since occurred in the board of trustees: John Cassel, John Landis, Charles Fisher and Jacob Rife, appointed in the will; William Crabb, Sen. elected in the room of Jacob Rife deceased, the 5th of September 1807; Joseph Burd, elected in the room of Charles Fisher deceased, the 30th of May 1808; John Elliot, elected in the room of Joseph Burd resigned, the 3d of December 1810; Jacob Hershey, elected in the room of John Elliot resigned, the 25th of February 1812; Ephraim Heller and John Smith, elected in the room of William Crabb deceased, and John Landis resigned, the 8th of December 1813; George Lowman, elected in the room of John Smith deceased, on the 19th of July 1820; Christian Spayd, elected principal on the 20th of January 1814, in the room of John Cassel resigned, approved the 12th of February 1815.

The auditors were appointed to take the accounts of Christian Spayd, George Lowman and John Cassel. From the foregoing review, it appears that John Cassel has been a permanent trustee, and that he was principal of the institution from about the 1st of June 1806 until the 29th of January 1814, seven years and eight months. That Christian Spayd has not been elected trustee, but has been principal, of the institution from the 12th of February 1814. His account, as taken by the auditors, terminated on the 26th of Octo-

ber 1829, making a period of fifteen years and eight and a half months.

The real estate devised to the trustees consisted of,

1. The grist-mill at Middletown.

2. The M'Clenachan farm, near Middletown, containing about five hundred acres.

3. The M'Clure farm, near Middletown, containing two hundred and eighty-five acres.

4. The Middletown tract, containing one hundred and twenty acres.

5. The mansion house in Middletown, devised to the widow during life.

6. The Hemperly house in Middletown.

7. Two houses in Middletown.

8. A number of unimproved lots in Middletown.

9. Ground rents in Middletown, on upwards of one hundred lots, the amount of annual income not exactly ascertained—it exceeds 100 dollars.

10. The Beaver Dam tract—directed to be sold by the trustees.

The following sales of part of this devised estate were had upon legal process for debts, as it appears, which were contracted by the testator.

1. House and lot in Middletown, sold by sheriff in 1809, for 819 dollars.

2. Two lots in Middletown, sold by sheriff in 1810, for 490 dollars.

3. Twenty-five lots in Middletown, sold by sheriff in 1811, for 1123 dollars.

4. Part of the M'Clenachan farm, by order of orphan's court in 1818, for 3990 dollars.

The following sales of parts of the devised estate were had upon legal process, for debts contracted by the executors.

5. The Hemperly house, sold by the sheriff in 1815, for 1300 dollars.

6. Part of the M'Clure farm, sold by the sheriff in 1827, for 2595 dollars.

7. Mansion house farm, sold by the sheriff in 1829, for 2200 dollars.

A tract of land in Huntingdon county, being part of the descended estate in consequence of the decision on the codicil, was sold in 1816 upon an execution for a debt due by the estate for 2510 dollars.

Balances were received by the principal upon some of the above sales, which were credited to the estate.

The Beaver Dam tract was sold in 1811 by John Cassel and John Landis, for 2666 dollars 67 cents.

No part of the proceeds of the sale of the Beaver Dam tract has been traced by the evidence into the hands of John Cassel: he says upon his oath that the business was transacted by John Landis, who held the title papers and disposed of the proceeds of the sale. There is no reason not to believe this statement to be correct.

III.—3 D

The inventory of the personal estate of the testator,
besides grain in the ground, &c. to which no definite
value was affixed by the appraisers, amounted to ............ 26,916 44

Of this inventory the personal estate bequeathed to
the widow of the testator amounted to .......... $3,588 23

Desperate debts were stated to amount to ....... 14,044 05
                                                  ————————
                                                              17,632 28
                                                              ————————
                                                              $9,284 16

Leaving 9284 dollars 16 cents as the amount of available personal
estate, which, according to the inventory, came to the hands of the
executors, besides the grain, &c. above mentioned.

The only accounts settled in the orphan's court of Dauphin county,
by the executors, are the following by John Landis, who states him-
self to have been the acting executor.

No. 1, settled the 4th of March 1816, in which he
charges himself with having received from the estate ...... $5,939 74¼

No. 2, settled the 5th of March 1816, in which he
charges himself with having received ........................ 190 00
                                                              ————————
                                                              $6,129 74¼

No notice is taken in either of the accounts of the inventory; nei-
ther does it appear that the whole amount with which he charges
himself formed part of the inventory.

The first of the above mentioned accounts was filed in the regis-
ter's office on the 11th of December 1811, and in the charges to the
accountant he refers to an account or accounts " *stated and settled by
the court of common pleas and filed of record according to the provisions
of the will of the testator.*" No such accounts thus referred to were
exhibited to the auditors, who were called upon to charge John
Cassel with the amount of the inventory. They were told the ac-
counts could not be found. By the second account, a balance re-
sulted in favour of the accountant, John Landis, of 3158 dollars 52
cents, upon which the sale under the order of the orphan's court in
1818, supposed to be on account of debts of the testator already
referred to, was made.

The auditors have made out this statement of the real and per-
sonal property of the testator, with a view of presenting the character
of the estate and the difficulties in the way of a satisfactory settle-
ment, the facts being imperfect and disjointed, the accounts of the
executors and trustees being intermingled, and no settlement which
can be considered a starting-place having been made in twenty-four
years.

After having given the instructions to the accountants, as has
been mentioned, for the purpose of obtaining a detailed account of
the receipts and disbursements of John Cassel, during the period he
was principal, arranged in order and classed, he presented the ac-
count herewith submitted.

[Ex parte Cassel and Spayd.]

The whole amount of his receipts for seven years and
eight months, as stated in this account, is ..................... $5,987 57
  In which is included three years rent of
the mill, in advance from 1814 to 1817,     2,000 00
    Wood sold,                                 133 85
    Old debt, &c.                    1,096 46
                                         ————— 3,230 31
                                                  $2,757 26

Leaving 2757 dollars 26 cents, for his receipts on account of the pro-
ceeds of the trust estate during the said period; a sum palpably below
what must have been produced. With this deficiency on the one
hand, and on the other, a plain, honest man, with a mutilated Ger-
man account book, which he stated upon his oath contained a true
history of his receipts and disbursements, the auditors were called
upon to decide whether he was liable for the deficiency, and if liable,
then to find the amount of the deficiency. It is somewhere well
said, "that we cannot begin to reason until we are furnished other-
wise than by reason with some truths on which we can found an
argument." In this case, the auditors are not furnished with such
distinct facts as will enable them to draw satisfactory conclusions.

As to the question whether the accountant is liable for the defi-
ciency, it may be remarked, that he stated to the auditors that John
Landis and William Crabb, the former a co-executor and trustee,
and the latter a trustee, elected 5th of December 1807, were active
men, and transacted the principal business, that the accountant be-
ing unable to understand the English language, the accounts were
kept under their supervision, and that he kept a statement in Ger-
man of that part of the estate which came to and passed through his
hands. From an examination of the books thus kept, it appears, in
corroboration of the statement made by the accountant, that John
Landis did receive and pay money at various times, and to a consid-
erable amount, which should have passed according to the directions
of the will, through the hands of the accountant. Now, although
this manner of transacting the business, is not in conformity with
the rules laid down in the will for the government of the officers,
particularly when the orphan-house shall be in operation, yet it was
very reasonable, perhaps right, that a competent co-trustee should
settle claims and transact business in which there was a common
interest, and for the performance of which duties the agent appointed
*by the testator* was, from the want of education, incompetent; more
especially, as the other trustees might be held responsible for his
acts, under that clause of the will which directs that he shall be sub-
ject to their advice, and conform to their directions. Whether the
other trustees took advantage of this disability of the principal, and
if they did, to what extent, and whether they made it subservient to
other purposes than those of a faithful administration of the trust,
and what amount of the proceeds of the trust estate passed through

their hands, are matters which, from the evidence before them, the auditors are unable to determine.

As to the amount of the deficiency, there is equal uncertainty. The annual value of the estate does not appear to the auditors, and they are left to conjecture.

As the testator was an old man for some years before his death, and kept this large property under his own supervision and care, it may be presumed that the estate, when it came into the hands of the trustees, partook in some degree of the character of him who left it. The accountant stated to the auditors that the mill and farms were out of repair, and to a great degree unproductive; that Shipler, one of the millers, recovered damages because of defects in the mill, and that he could not go on successfully with the management of the estate for want of means. There is reason to believe that it is an expensive estate to keep in repair.

He also stated that he settled an account for one year of his administration in the court of Dauphin county, according to the directions of this will: this account it seems cannot now be found, neither can the amount included in it be ascertained.

From the manner in which the accountant kept his accounts, and the understanding he had of his duty, it appears that in settlements with persons having dealings with the estate, he only noticed the balances after setting off produce, &c. against work, &c.: in this way a portion of the deficiency may be accounted for, but the amount is uncertain.

Under these circumstances, the auditors, after a patient and laborious investigation, came unanimously to the conclusion, that it would be right and equitable to take the said account of John Cassel as a faithful exhibit of that portion of the trust estate which passed through his hands, and that he ought not to be held liable for any thing more. It appeared satisfactorily that he did not add to his private estate by the office he held in the institution, and that he is a man of honesty, industry and truth. It may be also well to add that near sixteen years have elapsed since he resigned; that the principal part of these transactions took place upwards of twenty years ago; and that in 1821 his account, as principal, was finally settled and adjusted by the trustees, who were supposed to be the only competent authority for the purpose.

It appears that in 1814, when John Cassel resigned the office of principal, the trust estate was indebted as follows:

Debts due to a number of persons, which appear to have been contracted since the death of the testator,    $2,001 39

Judgment in favour of Thomas Duncan, Esq.    2,100 00

Judgment in favour of Charles Smith, Esq.    3,868 60

Due John Cassel, including his salary and the wages of his children, &c., which in March, when the same was liquidated by the trustees, amounted to    2,900 00

$10,869 99

Debts due in 1814, which had been contracted by the testator:
Oberlander's judgment,                                    $4,231 63
The balance due John Landis in 1816, when he set-
tled his account as executor, supposed to consist of debts
due by the testator,                                         3,158 52
                                                           ——————
                                                           $7,390 15

Now either the testator was greatly mistaken in the value of his estate and the amount of debts due by him, or there was gross mismanagement on the part of the agents. That the former was in a degree the case, it is reasonable to believe; the strong presumption, however, is, that the latter was the fact to a considerable extent. Accounts as already stated were settled, which are not to be found; what amount of debts were paid, and what amount of proceeds of the inventory or of the trust estate were charged in these accounts, cannot from the evidence before the auditors be ascertained. The accounts of the executors are blended with the accounts of the trustees, and much of the mismanagement may have originated with the executors, who are not before the auditors. The fact is, that the transactions of those years are involved in so much obscurity, doubt and uncertainty, as give the mind inquiring for the truth no resting place. The auditors, however, are satisfied that neither fraud or deception has been traced to the accountant, but that he appears in the honesty and simplicity of his nature to have industriously laboured with his family for upwards of seven years, upon the trust estate, under very untoward circumstances; that he was guided by a sincere desire faithfully to discharge his duty, and that he did not increase his private estate. His conduct, too, before the auditors, has been broadly marked by candour and uprightness.

A part of the testator's estate, in consequence of the verdict against the codicil, descended to his heirs; and as a part of the trust estate was sold for the payment of debts, it was strongly urged that the accountant should be held liable for the value of this descended estate, because it was not appropriated to the payment of debts for the relief of the devised estate. The accountant declares that he was ignorant of the character and value of the descended estate, as he in the discharge of his duty believed he had nothing to do with it.

Granting the principle that the descended estate is first liable for the payment of debts, an insuperable difficulty arises in this case. From the evidence, and the manner in which the accounts of the executors were kept and settled, it cannot be ascertained whether the personal estate of the testator was, or was not adequate to the payment of all his debts; and supposing it was, would the rule include debts contracted by the executors. The law seems to say that it would not, and reason and justice do most heartily concur. It would be most unrighteous to hold the descended estate liable for debts created by the executors to defeat the heirs by the establishment of the will.

The next in order is the account of Christian Spayd, who is now

and has been the principal since February 1814, fifteen years and eight and one half months, the account being taken up to the 26th of October 1829.

It is proper to remark here, that from the evidence, the estate, when it came into the hands of Mr Spayd was not in prosperous circumstances. There were debts due, which with the interest that accrued before they were paid, amounted to 18,260 dollars 14½ cents. The mill, which should have been the most productive part of the estate, was rented for three years for the payment of 2000 dollars—part of those debts and the expenses of building a new dam, stated by the accountant to have cost between 4000 and 5000 dollars, and the keeping the same, the mill, the race, &c. in repair, amounted to a large sum of money. One of the farms was rented to John Cassel for the payment of a debt due to him, and the other farms required repairs.

The auditors, after having examined the accounts first presented, and the books and the manner of keeping them, directed a classification of the items to be made and so arranged as to exhibit the receipts and expenditures in an intelligible form. The account herewith presented was the result of this order. In its present form, it is not perfect in its arrangement. In the receipts for grain, &c. sold, are included items, such as balances upon the sales of real estates, &c. which do not properly belong to this head; and others which do belong to it are excluded, such as the hay and grain, feed to the stock of the accountant, and fare used in his family, which in a period of near sixteen years would amount to a considerable sum. It was not practicable, from the manner in which the accounts were kept, to ascertain the sums annually received from the estate.

The aggregate is presented, and upon making allowances for imperfections alluded to, and comparing it with the testimony, the auditors are of the opinion that it amounts to a satisfactory return.

Under the head of repairs are included a payment for wheat, for a horse, for clover seed, &c. and for chopping the wood which was sold, which if deducted from the credit for repairs, together with the costs of the new mill-dam, would in the opinion of the auditors leave a sum by no means unreasonable for ordinary repairs during the period, when the condition of the estate at the time the accountant entered upon it is taken into view and *compared* with its present condition: besides, the accountant had made a return of personal property in his use belonging to the trust estate amounting to 813 dollars 87½ cents, as per schedule, inserted on    page of the account.

The auditors have deducted from the credit asked for household expenses such items as in their opinion do not come within the provision in the will for a free table, which leaves a credit on this account of 9008 dollars 51 cents, including articles furnished the widow of the testator, 445 dollars 92 cents, which were allowed by the auditors, amounting to 8562 dollars 59 cents.

In this sum of 8562 dollars 59 cents are included a number of items which do not properly belong to this head, so that in the opinion

[Ex parte Cassel and Spayd.]

of the auditors the amount for house expenses and servants' wages for near sixteen years, for which the credit is admitted, is reasonable, particularly when the fact that the principal boarded the hands employed in building the dam and repairing the estate is taken into consideration.

The corrections and deductions made by the auditors appear upon pages 69 and 70 of the account, and exhibit a balance in favour of the accountant of 6378 dollars $97\frac{1}{2}$ cents.

The other items in the account do not in the opinion of the auditors require any explanation. They were all examined in detail. There were thirty-four exceptions filed to this, and thirty-five exceptions to the account of John Cassel. These exceptions were all patiently and particularly investigated and examined in connexion with the testimony, and the result appears in this report, which has been unanimously adopted, and in the accounts annexed.

The statement under oath of George Lowman, the other trustee, whose account was directed to be taken, is herewith submitted. There was no evidence produced that any part of the trust estate came into his hands, or that he made any payments.

The interrogatories of the counsel for the petitioners, and the answers for the accountants, and the parol and documentary testimony presented to the auditors accompany this report.

It is but justice to add, that the accountants evinced before the auditors a disposition freely to give every explanation in relation to this complicated settlement in their power, and that their conduct was marked by a degree of frankness and candour worthy of commendation.

Witness the hands and seals of the auditors at Harrisburg, the 22d November 1830.

FRANCIS R. SHUNK,
WM. CLARKE,
V. HUMMEL.

Recapitulation of the account of John Cassel, late principal under the will of George Frey deceased :—

Dr to the estate.

| | | |
|---|---:|---:|
| For amount received for produce of the farm, and for work done by the labourers belonging to the farm, | $718 | 97 |
| Received for wood, &c. sold, | 133 | 85 |
| For ground rent, | 280 | 60 |
| From the mill, | 2,518 | 97 |
| Received for rent, | 1,238 | 72 |
| For old debts, | 1,096 | 46 |
| Total receipts, | $5,987 | 57 |
| Balance due accountant by the estate on 26th January 1814, when accountant resigned his situation as principal, | 521 | 06 |
| | $6,508 | 63 |

[Ex parte Cassel and Spayd.]

Contra.

| | |
|---|---|
| Amount paid for repairs to the estate, | $498 95 |
| Paid for family expenses, &c., | 276 91 |
| Paid for servants' wages, | 1,293 66 |
| Amount of travelling and other expenses incurred in attending to lawsuits, | 141 36 |
| Paid for taxes, | 247 56 |
| Paid for instruments and articles necessary for the mill and for the cultivation of the estate, | 628 70 |
| Amount paid for old debts, costs, &c., | 3,421 49 |
| | $6,508 63 |

| | |
|---|---|
| Accountant further charges himself with a balance of money received by him for the institution, and not appropriated, | $160 00 |
| To an appraisement of sundry goods taken by accountant on the 5th of February 1816, | 516 50 |
| To four years rent on town land, at 300 dollars per year, | 1,200 00 |
| To three and a half years, at 200 dollars, | 700 00 |
| Balance due accountant, | 711 84½ |
| | $3,288 34½ |

| | |
|---|---|
| Balance in favour of accountant on preceding settlement with principal and trustees, less $5 49½, | 515 56½ |
| From March 7th, 1821. By seven years and eight months wages as principal, viz. from 1806 till 1814, at 100 pounds per year, pursuant to will, | 2,017 78 |
| Wages for two girls and one boy for seven years and eight months, | 550 00 |
| Seventy bushels of wheat furnished, | 105 00 |
| Fifty bushels of rye, | 50 00 |
| Fifty bushels of corn, | 25 00 |
| Fifty bushels of oats, | 25 00 |
| | $3,288 34½ |

| | |
|---|---|
| Upon the above balance interest was allowed till 7th March 1821, viz. | $288 15½ |
| Balance, | 711 84½ |
| | $1,000 00 |

To discharge this balance of 1000 dollars, a tract of land belonging to the estate of George Frey deceased, was leased to John Cassel the accountant, for the term of eight years from the 1st of April 1821, which term expired on the 1st of April last, viz. April 1st, 1829.

[Ex parte Cassel and Spayd.]

Recapitulation of the account of Christian Spayd, present principal under the will of George Frey deceased:—

| | |
|---|---:|
| Amount of grain and hay sold, | $7,908 46 |
| Wood sold, | 2,486 90 |
| Ground rent, | 1,403 00 |
| Rents of mill and real estate, | 8,083 74 |
| Sundries not included in the above, | 2,169 64 |
| Receipts of saw-mill, | 3,935 64 |
| Error on credit side, | 30 00 |
| | $26,017 38 |
| Balance due accountant, | 4,840 72 |
| | 30,858 10 |

Accountant further adds 4188 dollars 94 cents for services as principal, making a balance in his favour of 9029 dollars 67 cents.

Accountant asks credit for

| | |
|---|---:|
| House expenses, | $11,428 71 |
| Repairs, | 12,039 49 |
| Taxes paid, | 1,615 19 |
| Paid on account of debts, | 1,324 73 |
| For tuition for institution, | 1,053 91 |
| Outstanding debts charged, | 842 97 |
| Expense of building saw-mill, | 2,493 70 |
| Errors on debtor side, | 59 40 |
| | $30,858 10 |

Exceptions to the report of the auditors appointed by the supreme court to examine the account of Christian Spayd, principal under the will of George Frey deceased:—

1. They should have charged him with all the proceeds of the trust estate which he received or might have received, and especially with that part of the same occupied by John Cassel from the spring of 1814 until 1829, viz. 2900 dollars, which last sum they should also have disallowed, and not credited.

2. They should have disallowed his credit for outstanding debts to the amount of 570 dollars, because they were bound by the statute of limitations.

3. He should be charged with money due the estate by Thomas Duncan, Esq., George Fisher, Esq. and E. Greenough, Esq.

4. They should have charged him with goods taken by John Cassel after his resignation as principal, amounting to 516 dollars 50 cents.

5. They should have charged him with the balance due the estate by John Cassel.

6. They should have disallowed his credit for moneys paid and goods furnished Mrs Frey, amounting to 690 dollars 4 cents.

7. They should have disallowed all credits for which vouchers

III.—3 E

were not produced, as the same will appear on his account, the items for which vouchers were produced being marked with the letter R.

8. They should have disallowed his credits for household expenses, amounting to 11,428 dollars 71 cents.

9. They should have disallowed his charge of 12,039 dollars 49 cents for repairs, as unreasonable and extravagant.

10. They should have disallowed his credit for money paid F. Miller for tuition and boarding, amounting to 1053 dollars 91 cents, because the school never was conducted as prescribed by the will.

11. They should have disallowed altogether his charge for services as principal, viz. 4188 dollars 94 cents.

Exceptions to the report of auditors appointed by the supreme court to investigate the account of John Cassel, principal and trustees under the will of George Frey :—

1. They have not charged John Cassel with the amount of the inventory of George Frey's personal estate, 9284 dollars 16 cents of which the auditors, on page 6 of their report, admit to have been available.

2. They have not charged him with the whole of the rents, issues and profits of the trust estate, exclusive of the mill, which he received or should have received.

3. They have not charged him with the rents, issues and profits of the mill. During the years 1806, 1807, 1808 and 1812 he acknowledges no receipt from the mill, and but 518 dollars 97 cents during the years 1809, 1810, 1811 and 1813.

4. They have not charged him with |2666 dollars 67 cents, the proceeds of the sale of the Beaver Dam tract of land in Union county, though he acknowledges that he joined in the sale of it; nor with the rents of said farm from 1806 until the sale in 1812.

5. They have not charged him with all the ground rents which were or should have been received by him.

6. They have not charged him with 754 dollars 92 cents received from John Landis, as appears by said Landis's account, filed December 1811.

7. They have not charged him with 1055 dollars 4 cents for grain furnished him by —— Bucher, and settled for by Christian Spayd.

8. They should have disallowed his credit for money paid by him to F. Miller for tuition and for his boarding, amounting to 543 dollars 96 cents.

9. They should have disallowed the credits on pages 5 and 7 of his account for family expenses, amounting to 276 dollars 91 cents, they not being the produce of the trust estate, and the institution not being established; until which time he was not entitled as principal to a free table.

10. They should have disallowed the credits on page 25 of his account for wheat purchased, amounting to 528 dollars 45 cents.

11. They should have disallowed his credits for 1293 dollars 66 cents, for servants' wages.

12. They should have disallowed 515 dollars 56½ cents, his bal-

[*Ex parte Cassel and Spayd.*]

ance claimed on settlement on page 35 of account, not being just, and not legally ascertained.

13. They should have disallowed his credits for wages for two girls and a boy, amounting to 550 dollars.

14. They should have disallowed his wages as principal, amounting to 2017 dollars 78 cents, he not being in justice entitled to that sum, and the institution never having been established; and because he was guilty of gross misconduct in the management of the estate, and did not manage the same as directed by the will of George Frey deceased.

Parol testimony, given before auditors in the case of the estate of George Frey deceased :—

September 10, 1829. John Cassel, examined. No part of the personal property in the inventory ever came to my hands; the grain was used in the management of the estate to keep house. I had many hands at work at the race, &c. Things went on as if Mr Frey had been living. The grain that was sold I had charged myself with in my account. I settled an account before the grand jury for one year, ending October 1807. I cannot recollect that any of the debts, but some of Cronemiller's, came into my hands. I charged myself with whatever came into my hands. A list of the notes and bonds did not come into my hands. The bonds and notes, I expect, were kept by Mr Landis and the other trustees : they never came into my hands. I received no cash of Frey. I do not know that he had any at his death. The widow, I expect, kept the money. Don't know Frey had money. I got none, neither do I know that any of the other trustees got any : I cannot tell whether the bonds and notes in the inventory were collected by the other trustees, except some money got in Philadelphia by John Landis. The widow got the horses, cows, wagons, &c. and every thing in and about the house, store goods and all, except some hogs at the mill. Crabb and Landis sold some of them and got the money. The rest were used by me in the management of the estate. I do not know that the widow got any of the notes and bonds. While I was concerned, the widow got nothing from me towards her support, except perhaps a load of hay. The widow died six or seven years ago. The widow made a vendue and sold things; the stock and some of the store goods. I guess she sold the whole, except what she wanted to keep house. She gave me no part of the proceeds. I did not interfere to prevent her from selling ; some of the other trustees did, but it seems she had a right to keep these things and to do with them as she pleased. Shepley, the miller, brought suit against me for damages and recovered judgment, because the mill was out of order.

May 22. Spayd called on me and got me to go along and get the order to sell land, according to the petition to the orphan's court of 1818 to sell trust estate for the payment of debts. Spayd did the business and made the sale. It could not be done without I was along, as I was executor.

June 3. In 1814, before I resigned, when sheriff Kelker was sell-

ing the mill, I know of no compulsion before Spayd. He said if I was tired, and would let him in, I should live on the place on a low rent. He said if my family was agreed—my wife was tired of it—he said he would give me a better bargain than any one else; he allowed I deserved it. We had no further bargain. When we settled, then the trustees allowed Spayd had no right to give me any advantage, and they charged me full rent on settlement in 1821. I lived on the town land seven years. He charged me to 1821, for town land, 300 dollars a year for four years, and 200 dollars a year for three years; I thought it high rent. We settled. The account we settled I considered justly due me on settlement in 1821; the rest was deducted and they fell into my debt. I had determined to resign before Spayd spoke to me about it. If Spayd had not interfered at that time and offered to pay the debt, the sale, which he did in my presence, I think the mill would have been sold by the sheriff. This was in 1814. I mind Swar was there, and others, to buy. It was selling on Oberlander's execution. Spayd, at that time, was (thus far is on first, page nine, auditors' report second page) not a principal or trustee. The people at Middletown always tried to get the advantage of me when I was in a pinch for workmen, &c. This was too much the case. Spayd spoke to me about resigning after he had spoken to the sheriff. Things went contrary. The sheriff was selling the property. I thought somebody else, may be, could manage better than I. I could not go on; I never had money to proceed; and for these reasons I resigned; I don't know that Spayd had the money to pay the sheriff, but he was just going to Philadelphia; he was then a storekeeper and had a good stand; shortly after the sale was stopped, we compromised; I leased to Bucher the mill, who advanced 2000 dollars towards Oberlander's debt, and we gave judgment for the balance. I do not know that the school for poor children, maintained by George Frey in his lifetime, was confined to the children of Lutheran parents; think it was not; a school was continued by him as it had been regulated during Frey's time; I think scholars of any denomination were admitted into the school; I told the master to go on as in Frey's time; I know of no other account books than those before the auditors; I don't know any thing about them; there may have been others; if there were, I don't know where they are; when I resigned, I gave all the books and papers in my possession to Spayd; they were packed in a desk as Seyfert had left them (Seyfert had been clerk); Landis and Crabb hackled me a good deal; always kept me in the dark; Crabb *sold a great deal of grain out of the mill;* they sold hogs; Landis and Crabb made the agreement with Shipler for the rent of the mill, and they told me to come to Harrisburg, where the agreement was signed; and then Shipler refused to settle with me, and said he had made the bargain with Landis and Crabb; I had a great deal of trouble with them; they refused to settle with me, and always said they had settled with the clerk. They managed so as to keep me in the dark. They sold every thing they could get money for, and always said to me that

[Ex parte Cassel and Spayd.]

they had a claim against the estate, and that the money they got was applied in payment of their debts. Landis and Crabb appointed John Crabb, who was Frey's clerk, to be the clerk, and his office was kept in one of Crabb's houses, where they did the business among themselves without consulting me. They got all the bonds and notes of Frey after his decease.

John M'Cammon. M'Clure farms, No. 1. The one John Young occupied, suppose it ought to have brought, since 1814, 200 dollars a year, tenant to make necessary repairs of worm fences, &c., not post and rail fences, and pay taxes. There is a small young orchard, stone house and large barn. Can't say the repair in which the property is at this time.

Cross-examined. Can't tell number of fields or size of them; can't tell quantity of land in farm, nor quantity wood land; can't tell quantity cleared by Cassel; he cleared some; can't tell whether there is wood upon the farm for repairing fences. When I say tenant ought to repair worm fences, I mean, if there is timber on the lands for making the rails.

M'Clure Farm, No. 2. Occupied by Melchior Rahm, Benjamin Young, &c. Land about as good as the other; log house, poor; so that a man can live in it; barn poor—heard tenant complain of it. I think it ought to have brought, since 1814, 200 dollars a year, tenant to make worm fences and pay taxes; can't tell quantity of cleared land on the places, think sufficient for raising grain and keeping stock; and don't know number of acres of this farm; since the sale to Ulrich of ninety-four acres, part of these two farms, one-third of 400 dollars should be annually deducted.

M'Clenachan Farm. The thirty acres of this farm that were sold were woodland; I say it ought to have yielded since 1814, 100 dollars a year; much repairing and very poor land.

Town land. Worth 200 dollars a year; my opinion is that the three farms and town lands, as having been worth since 1814, 700 dollars a year, clear of repairs and taxes.

Grist-mill. Should think, in my opinion, that the mill since 1814, should have brought in 500 dollars annually, besides paying the repairs of the mill itself; can't say as to cost of dam, race, &c., and I suppose the expense of race and dam to have been considerable; a dam in Cassel's time, built by Cassel, swept away; built like a Swede fence; Mr Spayd built a new dam or part of one.

John Bomberger. M'Clure Farm, No. 1. Stone house and barn, worth since 1814 250 dollars a year (there is no timber on this farm), clear of repairs and taxes.

M'Clure Farm, No. 2. Worth 200 dollars, may be, since 1814 annually, clear of taxes and repairs.

Cross-examined. I live in Back street, in Middletown; am a wagon maker; have lived there thirty-three or thirty-four years; I have not been a farmer during that period; only farmed little bits of lots, that's all.

M'Clenachan farm. Great deal of land, very poor; wood enough to fence it; I am no farmer; suppose the M'Clenachan farm worth about 200 dollars a year, clear of taxes and repairs; and suppose farmers round about there could tell value of farms better than I.

Town land. Suppose worth 300 dollars a year since 1814, clear of taxes and repairs; good soil, clay and sand.

Mill. I think it worth 500 dollars a year since 1814; if rented for six or seven years tenant ought to repair.

Cross-examined. I am no miller; Brestle told me he would give 700 dollars a year for three years.

Saw-mill. Can't tell what it brings in.

Michael Ulrich. I am a farmer; lived sixteen years in the neighbourhood of Middletown; I bought ninety-four acres of Frey's property for 2595 dollars, part of M'Clure farm; many farmers there know more about the mill than I do; I get grain ground there.

M'Clenachan farm. Ross paid 200 dollars a year; could not stand it; they sold him out; was a middling farmer; the farm was then not in as good condition as it is now; it has been mending for four or five years; it is now in pretty good order, worth about 200 dollars a year.

M'Clure farm. They paid 80 pounds for half, and 60 pounds for other half per year—Buck and Young; these farms are good as town land.

Town land. Yields good crops; pretty good land; might be worth from 250 to 300 dollars a year; if there was a good barn, it would bring 200 dollars a year, one year with another; without a barn 150 dollars.

Mill. I don't think mill would now bring more than 500 or 600 dollars a year, owner to keep it in repair; it costs a great deal to keep it up.

Cross-examined. Spayd made eighty pannels fence on M'Clure farm; such fence costs about $87\frac{1}{2}$ cents a pannel; Spayd annually hauls many stones to dam and race.

Christian Spayd. John Cassel, during his time as principal, dug a mill race from forty to fifty perches, pretty wide and deep, say eighteen feet wide and four or five feet deep; dam was carried away during Cassel's time; he built a new one that was swept away, and then he repaired the old one.

The school maintained by Frey during his lifetime was a German school, for poor children of all denominations. The rule was this; Frey employed Miller to teach poor children for a salary paid him by Frey, and the parents of scholars sent to the school, who could pay, paid Miller, which was to him so much compensation in addition to his salary. Says George Lowman never acted as trustee to his knowledge, and generally his (Lowman) affidavit is correct; as to prayers, necessity of consulting counsel, &c. as to the persuasion, at Lowman's house, he does not know it; I think he signed the lease to John Cassel In 1821 for the M'Clure farm. He never got any part of the property, or acted as trustee. He was present, I think, at a

meeting or two of the trustees. I do not recollect that Lowman was present in 1821, at the settlement with Cassel, may be he was. The election of Lowman was after prayers; prayers were first; I expressly reserved the right to consult counsel.

Joseph Ross. I purchased the mansion house for 2200 dollars, and have the title. I did not buy it for myself, I bought it for Mr Spayd. I guess Mr Spayd paid for it; I loaned Spayd 1000 dollars, and Carson loaned him 1000 dollars last spring. I do not recollect, or know that more than 2200 dollars had been offered at former attempt to sell the mansion house.

Cross-examined. I hold the deed in my name as security, and also have a judgment. This bill, 994 dollars 20 cents, Spayd got large amount of groceries; bill against him greater than this bill. He paid me difference, which he said was on his own account. [This bill I made out as Frey's estate; to my recollection, no clothing included in the bill. There may be small sums, dry goods, included; Spayd has dealt with me since 1823. When I settled with Spayd at different times, he would state amounts to be charged to the estate. He never took a receipt until lately, when I gave the receipt, as taken from my books; he generally paid his private account for goods he got for himself soon after they were got, and was credited in the blotter. Since I have lived at Middletown Spayd has always had hands at work on the estate, farm, &c. They boarded with Spayd.

Ephraim Heller. In most cases, if not all, the dry goods charged were got by or for Mrs Frey. She was a generous charitable woman to her friends, &c. Spayd had a habit always, when things were got for his family, to come and pay. This was his practice. In some cases goods got for Mrs Frey were charged to Spayd, as for her, and in some cases they were not. When goods were got by Spayd's hired girls, there are instances where Spayd assumed for them. I know that Mrs Frey always kept a glass of wine for her friends. She appeared to be a rational and sensible woman. The heavy charges for dry goods, in Spayd's account, were got by Mrs Frey. See the 23d of December 1818. These she said were for presents. I know some of her friends were there; she sometimes sent presents to her friends.

Cross-examined. I know Spayd always had a great many people about him working. They boarded with him. It was said of the mill, and I thought so myself, that it cost more than it brought in for repairs of mill race and dam. For several years, I think, after Spayd got it into possession, it must have cost him more than it produced; it was much out of repair. I know that the flood of 1817 did a great deal of injury. The gable of the mill gave way; he had to spring an arch. The forebay washed away, and the storehouse came down. I know the water got into the mill and burst up the floor. I know one year the race gave way. Spayd built one new dam, finished in 1818. There was a good deal of work done at the

new dam at the time of the flood of 1817. The old dam was use-less·when the new dam was commenced. When Spayd came into possession of the mill, he repaired the old dam—then the trustees assented to building a new dam (see their resolution in book of minutes), without which the mill would have been comparatively useless. Spayd, as far as I know, boarded all the hands employed in repairing mill, dam, &c. Can't tell how many hands were employed in building the dam—should think twenty or more. Dam is one hundred and ten yards long. Can't tell how long the mill was idle·when the dam was building in 1817. New dam was joined to old, so that some grinding was done that winter. New dam was finished next summer, when the mill was stopped again. The mill-wrights were at work when the dam was building. Can't tell how long the mill was idle. I think that winter the mill did but little; since that, when the Union Canal was making, the mill was stopped for several months. There were several other stoppings, can't tell length of time—once several weeks when they built the waste wear; stopped several times for several months.

Rev Mr Lochman. Has in his hand a square book called "Church book of the Lutheran Congregation at Middletown;" says, I found it among my father's books. He was the pastor of that congrega-tion; part of the record is in his·handwriting. My father died in 1826; he was their pastor from 1815; I know of no other church book belonging to the congregation. This book is No. 2. To my knowledge I never saw another. I was pastor of this congregation. I never made any entries in this book while pastor; and I made some for my father.

The cause was argued in this court by *Harris* and *Shoch*, for ex-ceptants.

*Fisher* and *Elder*, for accountants.

The opinion of the Court was delivered by

GIBSON, C. J.—This case is an additional instance of the futility of private charities. Even when established by law, and provided with the conservative apparatus of visitation, inspection and what-ever else ingenuity could contrive, these misdirected efforts of bene-volence have conduced but to the emolument of the agents entrusted with their care. So will it ever be where the vision of the visitor is not sharpened by individual interest. But these considerations enter not into the question of responsibility: for the unpromising aspect of the design furnishes no excuse for a neglect of the means. Neither are we to look with the greater indulgence on the embezzlement of those means because we may consider them as no better than thrown away. The trust was one which the founder had an undoubted right to create, and it is our business to do what we can for the ex-ecution of it. In every thing but security for the fidelity of the agents, its object was fully provided with the usual means of accom-

plishment.  The founder devoted to it a large and productive estate in or adjoining Middletown, consisting of a grist-mill, three farms containing nine hundred acres, mostly prime, four messuages, a number of town lots, and quit rents issuing out of more than a hundred others.  He devoted to it, also, the proceeds of a farm of two hundred acres in Middle Creek Valley, ordered to be sold ; his crop growing ; and, subject to the maintenance of his widow, his personal estate, amounting by the inventory to about 29,000 dollars.  At the most moderate computation this estate appears to have been worth 100,000 dollars ; and the object to be accomplished by the produce of it, was the maintenance and education in the German language and Lutheran faith, of a proportionate number of poor orphan children, in a building erected but not finished by the founder.  To this end the office of a " principal," or in other words an executive agent to manage the estate, was instituted at a salary of 100 pounds, and with a perquisite called a " free table," to be furnished from the produce of it ; and a tutor was directed to be employed at a salary of 200 dollars, and with the like perquisite.  The trustees constituting the admonitory council of the principal, were to receive a dollar respectively for each day's attendance.  These, with the incidental expenses of cultivation and repair, which were, however, to be lightened by the occasional labour of the pupils, were provided for as the main channels of disbursement.  Cassel, one of the respondents, went into possession as principal in June 1806, and continued in the office till February 1814, a period of seven years and eight months ; and the auditors have reported a balance in his favour, to speak in round numbers, of 700 dollars.  In favour of Spayd, who succeeded him and who had the office fifteen years and eight months when the accounts were taken, they have reported a balance of 9000 dollars.  Had the respondents performed their respective duties and accomplished the purpose of the trust, these balances, though sufficiently startling, might have been deemed to have accrued consistently with good management and fair dealing.  But when we find that not a single step had been taken for three and twenty years towards a dispensation of the founder's bounty ; that not a single orphan had had the benefit of it ; and that the orphan-house built by the founder has been suffered to rot till it is not worth the cost of repairing it ; that a considerable part of the estate has been dilapidated, and sold by the sheriff, a part of it to one of the respondents, and other parts of it to some of the trustees ; and that the respondents, having taken the profits without having fully accounted for them, yet claim to be let in as creditors on the fund to an amount that would bankrupt it, we are astounded by the magnitude and boldness of the pretension.  It has not been suggested that the incumbent meditates, even now, to accomplish the founder's design ; or that any thing is to be hoped from him in time to come, but to let matters go on in the old way till the residue of the estate is sunk or recovered by the heirs of the founder adversely to the trust.  The most that the respondents pro-

III.—3 F

fess to believe is, that it may support itself with good management, pay the salary of the principal, and supply his table. But if the purpose of the charity were no more than to give the principal a living, it had been better to give him the estate in full property. The respondent, Spayd, adds that it is in better condition in respect to improvements, repairs, produce and debts, than it has been heretofore. As regards the debts, the accuracy of this assertion is best tested by the documents. It appears by Cassel's petition for an order of sale, countersigned by Spayd and the trustees, that they were reduced to 4000 dollars in 1818; and from the answers to Dr Lochman's inquiries, it appears they had grown to 6000 dollars in 1820. They are now said to have mounted up to within a fraction of 10,000 dollars in 1829 when the accounts were taken—a sum nearly sufficient to swallow the residue. With the exception of a few hundred dollars, in outstanding debts, this sum is made up of salaries and maintenance allowed by the auditors as if they had been earned by an execution of the trust, though the actual business of the respondents was little more than to direct the cultivation of the estate and consume the produce of it. The excuse for not having attempted the education and maintenance of orphan children pursuant to the directions of the founder—for the employment of a master to teach an ordinary school is disclaimed as an attempt by the respondents themselves—is that the estate was embarrassed by counsel fees contracted to be paid in the trial of an issue to determine the validity of the will. These amounted to but 4800 dollars; and it appears by the admission of the respondents that the personal estate was sufficient to pay them. Deducting the enormous allowance of 14,000 dollars for desperate debts, the inventory produced 9000 dollars clear of the charge on it for the support of the widow. The only debt certainly known to have been left by the testator is Oberlander's judgment, which amounted in 1814 to 4200 dollars, and which, with the counsel fees, made up a round sum of 9000 dollars. By a proper application of the personal estate, therefore, every thing might have been paid; and it was culpable negligence in the respondents, if such were the fact, to suffer the executors to misapply or embezzle it. But to aid the personal estate they had the Beaver Dam farm, since sold for 1000 pounds, to which recourse might have been had. Whether the credits allowed in the administration account, settled by Landis in 1816, were for debts contracted by the testator, does not appear; neither does it appear that the matters with which he charged himself were part of the inventory. The gross irregularity of all judicial proceedings in regard to this estate, and certain references in the charges of Landis in his first account, to certain other accounts "stated and settled in the court of *common pleas*, and filed according to the provisions of the will," make it probable that the debts, without distinction of class, all went into the same account. At this distance of time, nothing like certainty can be obtained in respect to it, as the principal and trustees kept either very

imperfect accounts, or none at all; by reason of which every intendment of fact is to be made against them, according to the principle of Hart *v.* Ten Eyck, 2 *Johns. Ch. Rep.* 81—108. But in no aspect can this be material; for it distinctly appears that but a small part, if any, of the testator's debts was paid out of the personal estate. In answer to the interrogatories, Cassel admits that two houses and several lots in Middletown were sold for them by the sheriff, beside a house and lot at the Swatara landing; and it also appears that the rents of the mill were hypothecated by anticipation to satisfy the residue of Oberlander's judgment. It is perfectly reasonable, then, to suppose that the proceeds of the personal estate, and the Beaver Dam farm, were more than sufficient to remove the stumbling block interposed by the counsel fees. But independent of that, how could those fees occasion the difficulties ascribed to them, when the revenues of the estate were not applied to pay them, or to keep down the interest? Having been suffered to accumulate during the administration of Cassel, they were ultimately paid by repeated sales of portions of the land. Thus we see that the income of a valuable and productive estate, in the hands of the respondents, without an incumbrance to cripple it, has been wasted or embezzled, and the estate itself brought to the brink of ruin without an effort on their part to effect the purpose for which it was confided to them; and on the other hand, that the charges against themselves fall short of the truth, while they take credit, with surprising particularity, for every thing they could claim for a faithful performance of their duty. To confirm an account adjusted on such a basis, would redound to the lasting discredit of our jurisprudence.

On what basis then are they to be charged here? That a trustee is answerable for negligence only when it is so gross as to be evidence of wilful misconduct, is not to be disputed. But the reason of the rule shows that it is not for cases in which the trustee is to receive a stipulated compensation. It is said that a trustee, even of a charity, may not be charged for more than he has actually received, except for very supine negligence; and that the gratuitous nature of the service distinguishes him from a bailee for hire. 2 *Fonb.* 178. We apply the same rule to executors and administrators, though they have usually an allowance for their services, but strictly *ex gratia*, and not of right; but the foundation of it fails entirely when the trust has been accepted on terms of receiving a stipulated reward; and the respondents are therefore to account as bailees for hire. In the case of Cassel, the auditors have gone beyond the widest range of exemption accorded even to an unrequited trustee; and have omitted to charge him, not merely with what he might have got, but what he actually got. Though convinced, as they say they were, that the sum of his receipts, as charged, " was palpably below what must have been produced," they nevertheless unanimously agreed, " that it would be right and equitable to take

his account as a faithful exhibit of that part of the estate which came to his hands; and that he ought not to be liable for any thing more." This result seems to have been obtained exclusively from his not having increased his estate at a time when almost every one else who had an estate, lost it by an epidemic rage of speculation ; from his being a plain, honest, illiterate man, with a mutilated German account book, sworn to be a true history of his receipts and expenditure; and from the authority of an aphorism that " we cannot begin to reason till we are furnished, otherwise than by reason, with some truths on which we can found an argument." But whose business was it to supply these major and minor propositions? Certainly not that of the relators, who were strangers to the doings of the respondents, and could not be expected to produce proof of every bushel of grain or ton of hay grown on the estate for twenty years. On the principle of the aphorism, the respondents might have discharged themselves entirely, simply by withholding the evidence of their receipts. A trustee may be irresponsible for ordinary negligence; but he surely ought not to go clear with the proceeds of the fund notoriously in his pocket because he is unable or unwilling to specify the amount. Nothing could justify such a consequence but the irremediable want of a rule to charge him ; and happily such a rule *is* at hand, with materials for its application, furnished by the auditors themselves. Next to specification and proof of items, the clear yearly income of the estate, according to an estimate of it, may be assumed as a standard furnishing the nearest approximation to the truth of which the case is susceptible. I am aware that this standard was rejected in an anonymous case, 1 *Vern.* 45, where it was said that a mortgagee shall not account according to the value of the land, or be bound by proof that it was worth so much, unless it be shown that he actually made so much of it, or *might* have done so but for his *wilful default;* as, for instance, in turning out a sufficient tenant who had it at such a rent, or in rejecting one who would have given so much for it. But that he might have been charged with more than his actual receipts for misconduct, is shown not only by the exception in that case, but by other cases in the same book. In Coppring *v.* Cooke, 1 *Vern.* 270, a mortgagee who had prevented subsequent incumbrancers from entering on the mortgaged premises by having entered himself, and yet permitted the mortgagor to take the profits, was charged at the instance of the creditors coming to redeem him, with all he had or *might* have received since his entry. So in Bucks *v.* Gayer, 1 *Vern.* 258, a mortgagee who had recovered judgment in ejectment, but refused to take out execution, in order to favour the tenant in possession, who was insolvent and paid no rent, was ordered, at the instance of the mortgagor, to take out execution before the end of the term, or stand chargeable with the profits, as in case of wilful default. Is there not evidence of wilful default in the case before us? Setting aside the enormous waste and mismanagement

discoverable at a glance, the very refusal or inability to furnish a just and full account is sufficient to warrant a charge beyond what can be shown to have been received. In Myers *v.* Myers, 2 *M'Cord's Ch. Rep.* 217, 267, the very point occurred. An executor, trustee of a large real estate, who had kept no accounts, but had mixed up the profits with his own property, and purchased other estates with the proceeds of the whole, was ordered to account for the rents instead of the profits; and this part of the decree was affirmed by the court of appeals, the judge who delivered its opinion remarking, that the method adopted by the chancellor was the best, and perhaps the only one that could be resorted to with effect. On this principle, too, was determined Schieflin *v.* Stewart, 1 *Johns. Ch. Rep.* 60, in which the refusal of an administrator to account for the profits of assets employed for his benefit in trade, subjected him to compound interest as the highest standard to which the chancellor could recur. In every thing but the measure of interest, is not that essentially our case? On the same principle, too, is Hart *v.* Ten Eyck, already quoted; a case abounding with apposite and just conclusions in respect to the liability of trustees who furnish loose or imperfect accounts, and in which the omission of an inventory was deemed a proof of fraud. Of a part of Cassel's administration, he has given no account whatever; so that to reject his accounts entirely, and charge him by an estimate of the annual value, is a matter not of choice, but of necessity. Consistently with a sense of duty, we could not rest satisfied with either his credits or his charges, and by that means allow for a desertion of the trust, what was promised for a faithful execution of it.

There is no reason for withholding the same measure of accountability in Spayd's case. His accounts purport indeed to cover the whole period of his administration, but there is such convincing proof of his malversation as to make them, resting as they do on his personal credibility, an insecure foundation for a decree. The means by which he procured the office, shows that it was not sought for the good of the trust. His agreement with Cassel to let one of the farms to him at a reduced rent, as the price of his resignation, was, in truth, a purchase of his place with the proceeds of the fund, which entitles his representations to no very extraordinary confidence. But the intrinsic evidence of his accounts entitles them to still less. The sum of 23,000 dollars, credited for house expenses and repairs, balancing, as it nearly does, the consolidated revenues of the estate, is enormous. The item of house expenses alone is more than 11,000 dollars, while the produce of the farms in grain and hay sold, is put but at two-thirds of the sum. But the "free table," for which the respondent thus takes credit, and to which he would have entitled himself by a conscientious discharge of his duty, could be no more, by the most liberal construction, than such a living as a farmer gets from his own land, consisting of house-rent, fuel, grain, hay, vegeta-

bles, fruits, butchers' meat, poultry, and whatever else may be the immediate produce of the estate, as well as necessary groceries procured elsewhere; but the whole in moderation, as the restricted amount of the salaries indicates that the founder meant not to minister to luxury and extravagance. But as the house expenses were credited, it is not a little strange that the produce out of which they came was not correspondently charged; for it is incredible that all the grain, hay, vegetables, stock, butter, cheese, fruit, cider, poultry, eggs, and other matters produced by the estate, were sold; or that they netted no more than the sum charged if they were. Neither can it be supposed that the respondent advanced his own money for any thing but groceries. These things ought to have been produced by the estate, and not being fully charged, must have been consumed by the family, who surely could not have required additional articles of consumption, to the annual value of 700 dollars, a sum nearly three times as great as the principal's salary. And that the 12,000 dollars are not overcharged for repairs, being at the rate of 750 dollars the year, is altogether incredible.

On the principle now to be adopted, these matters sink into the estimate of the clear yearly value, being deducted from the gross produce in order to ascertain the net proceeds; and they are, therefore, to be dropped as particular items. As to the salary, unless the respondent is to be paid for mismanaging the estate for his own profit, it ought not to be allowed in either case; and the item of tuition, furnished in violation of the plain directions of the will, stands on no better foundation. In addition to these considerations, the very equivocal position of the respondent (Spayd) in relation to those who are claiming the estate adversely to the trust, evinced by his refusal to answer the interrogatories touching his consanguinity to one who was a claimant, and who died leaving a descendible interest alleged to be vested in the respondent himself; his supineness in respect to the bill, at one time before the legislature, to vest the property in those claimants or their representatives; and especially his refusal to permit the relators to take part by their counsel in defending against the actions of ejectment brought by them, must destroy all confidence of a personal nature in the accuracy of his accounts. But the credits taken for debts paid and expenses incurred in building the saw-mill, are to be allowed and deducted from the aggregate of the clear yearly income of the estate, to be ascertained by the standard presently to be named. On the other hand, he is to be charged with the amount of goods taken by Cassel after his resignation, but not with the balance now to be decreed against him, as the respondent has clearly not been guilty of such negligence in respect to it as to make it his proper debt.

It remains but to pronounce upon the sum at which the clear yearly profits of the estate are to be estimated and charged. On this part of the case we have the judgment of three witnesses, who put

[Ex parte Cassel and Spayd.]

the proceeds of the mill, farms and town lots, respectively, at 1200, 1250, and 1400 dollars; and we have the answers of the accountants themselves to the inquiries of Doctor Lochman, putting the proceeds of the whole at 1600 dollars, and substantially agreeing with the estimate of the witnesses. But as these estimates are ever inaccurate, and more frequently over than under the truth, we deem it safe to adopt the sum of 1000 dollars as the standard, being about one per cent on the capital; and we direct the prothonotary to restate the accounts on these principles, charging simple interest on the produce of each year, and allowing it on the credits.

Decree accordingly.